33 N.J. Super. 309 (1954)
110 A.2d 140
LOUIS MAIER, ET UX, PLAINTIFFS-APPELLANTS,
v.
MAYOR AND COUNCIL OF THE BOROUGH OF MOUNTAIN LAKES, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued December 6, 1954.
Decided December 17, 1954.
*310 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. Harold Valentine argued the cause for appellants.
Mr. Elden Mills argued the cause for respondents (Messrs. Mills & Mills, attorneys).
The opinion of the court was delivered by JAYNE, J.A.D.
In the year 1925 the Belhall Company was the owner for development purposes of a tract of land in the Borough of Mountain Lakes and on May 26, 1925 filed in the Morris County Clerk's office an approved map entitled *311 "Map No. 2, Property of the Belhall Company, Borough of Mountain Lakes, Morris County, New Jersey." The map disclosed the lakes within the boundaries of the tract and delineated and identified numerically the surrounding lots and plots.
On September 9, 1925 the Belhall Company conveyed by deed to the Borough of Mountain Lakes those portions of its property designated on a map previously filed on July 15, 1916 and on Map No. 2 to which reference has been made, as "Mountain Lake," "Wildwood Lake," the lake or pond lying between Boulevard West and Mountain Lake, sometimes known as the "Reservoir," and the waterways connecting the "Reservoir" with Mountain Lake and Wildwood Lake with Mountain Lake, "including the dams, walls and artificial embankments connected therewith and also the three tracts of land shown upon the first above-mentioned map and thereon designated as `Public Beach.'"
The conveyance was made upon the express condition that the designated lakes, waterways, and beaches should be maintained by the borough perpetually "for the free use by the property owners and residents of the Borough of Mountain Lakes."
It is of immediate importance to observe that the deed also embraced the following reservation:
"* * * Subject, however, to the right of the party of the first part, its grantees, successors or assigns, to build docks or boat houses, or both in said lakes in front of land now owned by it; and subject to the right of the present owners of land fronting upon said lakes and waterway, their heirs, successors and assigns, to free access to and use of the said Lakes and Waterways and the right to build docks, or boat houses or both in said Lakes in front of their respective lands. * * *" (Italics supplied.)
On May 31, 1950 Marion G. Burkhard and his wife, the owners of lot No. 98, Block J, contiguous to what may be called the southerly embankment of Mountain Lake, conveyed their lot by metes and bounds description to the plaintiffs.
*312 It may be inferred that the plaintiffs were profoundly interested in having the right to the unimpeded access to the lake from their property, for on July 5, 1950 they obtained from the North Jersey Liquidating Corporation a deed conveying to them all the right, title, and interest in lot No. 98 of the North Jersey Title Insurance Company of which the Belhall Company was a subsidiary; another deed from the Burkhards on October 31, 1950, and one from the trustees in dissolution of the North Jersey Liquidating Corporation on November 30, 1950 conveying to them all the right, title, and interest of those grantors "in and to the land lying between the flow line of Mountain Lake and the westerly boundary lines of Lot No. 98, Block J, as shown on" Map No. 2.
It is also disclosed that on July 5, 1950 the North Jersey Liquidating Corporation conveyed to Sanders and Brackin, a body corporate, all the remaining estates and interests of the North Jersey Title Insurance Company and of the Belhall Company in the tract, and the corporate grantee, Sanders and Brackin, on August 8, 1951 conveyed to the Borough of Mountain Lakes all of its right, title, and interest "in and to the land lying between the flow line of Mountain Lake and the westerly line of Lot 98, Block J, as shown on" Map No. 2. It has been said that trifles make up the happiness or the misery of life.
Those transactions conspicuously display the intense concern of the plaintiffs and the borough in the proprietary use of the narrow strip of land situate between the flow line of the lake and the boundary line of about 200 feet of lot 98, Block J.
The plaintiffs graded and surfaced their lot by the addition of about 400 loads of fill, erected upon it an exceptionally attractive residence facing the lake, landscaped and adorned the grounds with shrubbery, and provided a small recreational beach along the shore in front of the property.
On or about October 20, 1953, for some reason the merit of which is not satisfactorily elucidated, the borough erected along the southeasterly line of the interjacent strip a fence *313 "composed of approximately 18-inch square pillars, 14 to 16 inches high, with inch and a quarter rods between the pillars, which are on ten foot centers, an opening existing in the fence at the point of an angle of the westerly boundary line (of the plaintiffs' property) in order to permit access to and from the residence of the Maiers." Photographs depict the beauty of the plaintiffs' property and the frivolous inaptitude of the miniature barricade.
However, it is evident that this exploitation by the borough occasioned the institution of the present action by the plaintiffs against the borough.
The plaintiffs' original complaint sought equitable restraint against the borough from constructing the barrier and a determination of the legal title of the parties to the interjacent strip of land. At the time of the pretrial conference it had become consonant with the then existing situation for the plaintiffs to amend the prayer of their complaint to request a judgment exacting the removal of the obstruction by the borough.
The learned trial judge resolved that the defendant was the owner of the interlinear strip of land, with which determination we agree, but he also concluded that the plaintiffs as owners of lot 98 were not the beneficial landowners for whom the reservation of free access to the lake was intended by the provisions of the deed from the Belhall Company to the borough. With the latter conclusion of the trial judge we disagree.
We examine the deed and particularly the condition and reservations embodied in it in quest of the true intent and import of the reservations from the conveyance of "the right of the present owners of land fronting upon said lakes * * *."
The patent fundamental object of the grant was to transfer to the borough the maintenance of "the said Lakes, Waterways and Beaches * * * for the free use of the property owners * * *." To effectuate that object it was obviously necessary also to vest ownership in the borough of "the dams, walls and artificial embankments connected" *314 with the lakes. Having, then, in mind the knowledge of the parties to the conveyance of the passage to the borough of the title to those circumferential borders of land constituting the embankments of the lakes, it is not difficult to perceive the intent, meaning and nature of the easement reserved and the import of the designations "land fronting upon said lakes" and "in front of their respective lands."
We use the descriptive designation "ocean front property" nonetheless because there exists a municipally-owned boardwalk or perhaps a stone jetty between it and the ocean. Properties are commonly described as "lake front properties" although there is an intervenient public driveway. An hotel is said to front the park although the park is across the street. In none of such ordinary examples does the property adjoin or abut the high water level of either the ocean or the lake, nor is the suggested hotel property contiguous to the park, but they face immediately toward or have their front unobstructedly toward the ocean, lake, or park. Language is informational and expressive and sometimes a mixture of all. We note in the present case that at one point the front of the plaintiffs' lot extends as closely as six or eight feet to the flow line of the lake. Here the phrase "in front of their respective lands" further illuminates the intended meaning to be ascribed to "land fronting upon said lakes."
We have no doubt that the plaintiffs as owners of lot 98, deriving their title thereto from the Belhall Company, are entitled to the benefit of the reserved easement.
The easement definitely accords to them not merely access to the lake, but free access thereto, and the privilege of erecting a dock or boat house or both in front of their land. The frontage of the plaintiffs' land is about 200 feet in length.
In its context we believe "free access" to mean unobstructed, open, clear, unhampered, unrestricted, and unimpeded access. Webster's Int. Dict. (2d ed.), p. 1003, III, 7 and 8. We do not think that it was ever envisioned that the borough would erect any fence in front of such lots, *315 much less contemplated that the borough might at will supply the requisite access to the lake by providing one gateway in the fence perhaps at one or the other extremity of the frontage of the lot regardless of how inconvenient and disadvantageous its location to open passage from the residence to the permitted dock or boat house. Absurdity normally refutes itself.
The fence erected and maintained by the borough is an unlawful abridgment of the plaintiffs' right of free access to the lake from their property.
The judgment under review must therefore be modified and a final judgment entered declaring the legal title to the interjacent strip of land to be vested in the borough subject to the condition and reservations expressed in the Belhall Company deed, and that the defendant be ordered forthwith to remove entirely the fence at present existing between Mountain Lake and lot 98, Block J.